LYMAN LAMB Co. *v.* ARK. SHELL HOMES

5-3917                                     406 S. W. 2d 708

Opinion delivered September 26, 1966

[Rehearing denied October 24, 1966.]

*Bruce T. Bullion* and *Wayne Foster* and *W. J. Walker,* for appellant.

*John F. Park* and *Gerald T. Ridgeway* and *Owens, McHaney & McHaney,* for appellee.

GEORGE ROSE SMITH, Justice. For about two years Arkansas Shell Homes, Inc., acting as a contractor, built shell houses for landowners in Pulaski county. The venture ended in Shell's bankruptcy. The appellant, Lyman Lamb Company, was Shell's principal source of material for some 150 houses. When the company became insolvent it owed a number of accounts to Lamb, five of which are now in issue.

Lamb filed five suits to enforce materialman's liens against five of the houses, joining Shell and the various landowners as defendants. The cases were consolidated in the court below. The chancellor dismissed Lamb's complaints, finding that Lamb had perpetrated such a fraud upon Shell that all Lamb's claims were unenforceable. That finding presents the principal issue on appeal.

The asserted fraud involved a boat—a $2,000 party barge—that Lamb bought in March, 1962. According to Lamb, two of Shell's employees persuaded him to buy the boat and resell it to Shell for its employees' recreation. Lyman Lamb, president of the appellant, testified that he was told to collect the purchase price by submitting, for each shell house, a fictitious invoice for $50.00, describing material not actually delivered. (The invoices were in fact made out for $50.02 each.) The Lamb company followed that course and had recouped its entire outlay before the present suits arose. Thereafter no further dummy invoices were submitted.

Lamb's version of the transaction is contradicted by other testimony showing that the boat was originally a gift by Lamb to one or more of Shell's key employees. According to this testimony Lamb secretly recovered the cost of the gift by means of the false invoices, without the knowledge of Shell's top management. The chancellor credited this testimony, finding the transaction to be fraudulent. Upon that issue of credibility we cannot say that the trial court's conclusion is against the weight of the evidence.

Counsel all agree that if a fraudulent charge was consciously included in any of the accounts that account would be invalidated and the lien would fail. It is Lamb's contention that the boat deal was not involved in any of the five accounts now in issue and thus has no bearing upon this liitgation.

Lamb's contention cannot be sustained with respect

to one of the cases, that involving the Mitchell property. Early in the trial Lamb's attorney announced that it was reducing its claim against the Mitchell house by $50.02. Later on Lamb attempted to retract that concession, maintaining that it had been a mistake, that no fraudulent charge had been made against the Mitchells.

We are not convinced by this argument. Shell built a house for the Mitchells in 1962. Lamb admittedly made one of the false $50.02 charges in the course of that construction. A few months later Shell built an addition to the Mitchell house, which gave rise to the present lien claim. It is apparent that Lamb was morally obligated to the Mitchells for the false charge that had been made earlier. Hence we take Lamb's voluntary reduction of its claim to be a confession of wrongdoing having a foundation in fact. That asserted lien must fail.

A different situation exists with respect to the other four cases. Except for a few trivial errors that were made in good faith and so do not vitiate the lien claims, all the materials for which Lamb is now seeking payment went into the construction of those houses. In none of the four projects was a dummy invoice submitted, doubtless because Lamb had already recovered the cost of the boat.

Despite this fact counsel for the landowners insist that Lamb's claims are tainted by the boat transaction and that its lien affidavits were therefore consciously false. The argument is that Lamb, in asserting its liens, should have recognized that Shell had a cause of action against it for the recovery of the secret fictitious charges and that Lamb should somehow have given these four landowners some sort of pro rata credit for their derivative share of Shell's unasserted cause of action against Lamb.

This argument is unsound. These four landowners were not affected in any way whatever by the fictitious invoices. They have no legal or equitable right to be

subrogated to whatever cause of action Shell might have. If there was a fraud those who suffered from it were the landowners whose construction costs were padded by the false charges. Perhaps they or Shell or Shell's trustee in bankruptcy has an enforceable grievance against Lamb, but in no event could the recovery redound to the benefit of the present lienees.

To sustain the appellees' argument would be to establish a precedent that the courts could not live with in the future. Under the doctrine now being urged any materialman or laborer, before filing his lien affidavit, would have to search his conscience to see whether there was some extraneous cause of action that the principal contractor might bring into the case. If so, it would be the lienor's duty to inject such a collateral matter into the litigation, even though it had nothing at all to do with the matter in controversy. We are convinced that the better course is to let the contractor assert his own causes of action if he sees fit to do so.

One of the four claims, that against the Wawak property, presents two issues that we must consider upon trial *de novo*, though they were not reached by the chancellor.

First, it is contended that the Wawaks are entitled to credit for a payment of $1,627.17 that Shell tendered to Lamb on August 15, 1963. At Lamb's suggestion the money was actually credited to other accounts, but counsel for the Wawaks insist that Shell and Lamb did not have the power to apply the payment as they did.

We do not agree with this contention. The Wawaks, like the other landowners, financed their construction by a mortgage to a lending institution. Shell received the proceeds of the mortgage on March 26, 1963. The Wawak house was completed in May. Long before Shell's check was tendered to Lamb the proceeds of the Wawak loan had been spent by Shell in the payment of other debts,

leaving Shell still indebted to Lamb for materials that went into the Wawak house.

Shell was already in financial difficulty. It was from sixty to ninety days behind in its payments to Lamb. To avoid the filing of materialman's liens both Shell and Lamb wanted Shell's payments to be applied to the oldest accounts. To that end Lamb furnished Shell information from time to time about the age of the various accounts, and from that information Shell made notations upon its checks to Lamb of the amount to be applied to each account.

On August 15, long after the Wawak money had been expended, Shell sent Lamb a check with a notation that $1,627.17 of the remittance was to be applied to the Wawak account. Lyman Lamb noted that there were other accounts older than that arising from the Wawak job. Lamb's bookkeeper at once called Shell's bookkeeper, and the two agreed that the proceeds of the check would be applied to older accounts. The Wawaks knew nothing about the matter until the original notation on the check was discovered by an accountant while the parties were preparing for trial.

It is contended, on the authority of *Kelley Bros. Lbr. Co.* v. *Leming*, 220 Ark. 418, 248 S. W. 2d 359 (1952), that Shell and Lamb could not change the application of the payment. That case, however, differs materially from this one. There the payment had actually been applied to the Leming account. Leming had been so informed. The transaction had become final. More than a month later the contractor and the materialman tried to change the application. We held that such a change could not be made, to Leming's prejudice.

The present case differs from that one in essential respects. There was never any application of the payment to the Wawak account. Lamb in good faith suggested a different application from that proposed by Shell. That suggestion was accepted by Shell. The Wa-

waks knew nothing about the matter and of course did not rely upon the original notation on the check. In the circumstances there is no injustice in giving effect to the application agreed upon by Shell and Lamb. *Stephenson v. Ketchikan Spruce Mills,* 412 P. 2d 496 (Alaska 1966). Shell's ready acquiescence in Lamb's suggestion had the same effect as if the application had been made by Shell in the first place. *Garey* v. *Rufus Lillard Co.,* 196 Okla. 421, 165 P. 2d 344 (1945).

Second, the Wawaks raised a question of fact about whether all the materials charged to them had really been used in the construction of their home. Their principal witness was Mrs. Wawak. It was her recollection that the last work on the house, the installation of certain iron work, took place on May 2, 1963. On that premise she questioned an invoice indicating that materials priced at $10.28 had been delivered to the job four days later, on May 6. We think the weight of the evidence shows that Mrs. Wawak was mistaken in her recollection. Especially convincing is the testimony of the iron company's foreman, a disinterested witness. He testified that the company's records showed that the order for the Wawak work was received on May 2 but that the work was actually done on May 29. Upon the record as a whole we find the weight of the testimony to be against the Wawaks' contention that they were charged for materials not used in the construction of their house.

In the Mitchell case the decree is affirmed. In the other four cases the decree is reversed and the causes remanded for further proceedings in harmony with this opinion.